UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
In re:                                                       :
                                                             :    Chapter 7
    KOLLEL MATEH EFRAIM, LLC,                     :    Case No. 04-16410 (SMB)
    a/k/a MATEH EPHRAIM LLC, a/k/a                 :
    KOLEL MATEH EFRAIM,                            :
                                                             :
                       Debtor.               :
------------------------------------------------------------X
ROBERT L. GELTZER, as Chapter 7 Trustee of                   :
the Estate of Kollel Mateh Efraim, LLC, a/k/a                :
Mateh Ephraim LLC, a/k/a Kolel Mateh Efraim,                 :
                                                             :
                       Plaintiff,            :
                                                             :
         -- against --                                   :    Adv. Proc. No. 08-1265
                                                             :
JACK LEFKOWITZ and ABRAHAM                                   :
STEINWURZEL,                                                 :
                                                             :
                       Defendants.           :
------------------------------------------------------------X

## POST-TRIAL DECISION AND ORDER DISMISSING COMPLAINT

**A P P E A R A N C E S:**

HELLER, HOROWITZ & FEIT, P.C.
Attorneys for Jack Lefkowitz and Abraham
  Steinwurzel
292 Madison Avenue
New York, New York 10017

    Eli Feit, Esq.
    Stuart A. Blander, Esq.
        Of Counsel

SQUIRE, SANDERS & DEMPSEY LLP
Attorneys for Robert L. Geltzer, Trustee
30 Rockefeller Plaza
23rd Floor
New York, New York 10112

    Robert A. Wolf, Esq.
        Of Counsel

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

Robert Geltzer, the chapter 7 trustee (the "Trustee"), commenced this adversary proceeding alleging that the Defendants breached their fiduciary duties to the Debtor and should pay damages in the principal amount of $245,779, plus interest. The damages reflect the increased debt that the Debtor and the estate accrued by continuing to occupy certain real property for approximately three years. The Court conducted a bench trial at which both Defendants testified, and concludes that the Trustee failed to sustain his burden of ultimate persuasion. Accordingly, the complaint will be dismissed.

## BACKGROUND[1]

**A.     The Contract to Purchase the Meadows Property**

On or about April 29, 2004, Aron Fixler entered into a contract of sale (the "Contract") with Helen-May Holdings, LLC ("Helen-May") to purchase the Meadows Property (the "Property") located in Fosterdale, New York for a price of $1.4 million. The Property consisted of a resort hotel located on 60 to 77 acres, with seven major buildings, six residential buildings, and rooms accommodating a total of 103 guests. Geltzer v. Helen-May Holdings, LLC (In re Kollel Mateh Efraim, LLC), Adv. Proc. Nos. 04-4545, 08-1265, 2010 WL 3782050, at *1 (Bankr. S.D.N.Y. Sept. 21, 2010).[2]  The closing was scheduled for June 1, 2004.

---

[1]     The Defendants have adopted the Plaintiff's Proposed Findings of Fact 1 through 39 (excluding 2a) and 54 through 58. (See Defendants' Proposed Findings of Fact and Conclusions of Law, dated Mar. 8, 2011, at ¶ 1 (ECF Doc. # 44).)  Where the Defendants have not adopted the Trustee's proposed findings of fact, the opinion has striven to include record references.

[2]     One of the damage issues presented in this adversary proceeding was tried separately with a related issue in the main case. The decision cited in the text, supra, reflects the Court's findings of fact and conclusions of law following that trial.

2

Three weeks later, Fixler assigned his interest in the Contract to the Debtor, a New York limited liability company. At all relevant times, the Defendant Jack Lefkowitz ("Lefkowitz") was the Debtor's Managing Member and sole Member. Lefkowitz intended to develop the Property as a summer community, constructing and selling homes on two acre lots. In addition, he planned to use the Property as an all-year-round destination where people could participate in various activities offered at the adjacent hotel and camp. (See Tr. 84–85.)[3] The Debtor subsequently acquired two contiguous properties (the "Debtor Properties") for $450,000 in furtherance of the development plan. (Tr. 101.)

The Contract did not close as scheduled. Instead, the parties entered into a letter agreement dated June 3, 2004 (the "Occupancy Agreement"). Among other things, the Occupancy Agreement extended the closing date to September 27, 2004. In the interim, it authorized the Debtor to occupy the Property and operate it in accordance with its present use. In exchange, the Debtor agreed to pay certain carrying charges, an additional down payment of $40,000 (increased from $100,000 to $140,000), and a daily fee in the sum of $1,500 if the closing did not occur by September 27, 2004, and the Debtor continued to occupy the Property after that date. The Occupancy Agreement did not spell out a termination procedure except in the case of the Debtor's default. Although the Occupancy Agreement expressly contemplated the execution of a more formal agreement, the parties never executed that agreement.

The Debtor commenced its occupancy of the Property sometime in June 2004, but the parties did not close the Contract by the new date. Instead, on or about September 22, 2004, they

---

[3] The following conventions are used in citing to the record. Unless otherwise noted, all ECF Doc. #s refer to Adv. Proc. No. 08-1265. "Tr." refers to the transcript of the hearing held December 15, 2010 (ECF Doc. # 46). "JX" refers to Joint Trial Exhibits. "DX" refers to Defendants' Exhibits.

3

amended the Occupancy Agreement by executing a second letter agreement (the "Extension Agreement"). The Extension Agreement, inter alia, extended the closing date to November 29, 2004 and required the Debtor to pay the additional sum of $20,250 upon return of the Extension Agreement and another $20,250 on or before October 27, 2004. Except as expressly amended, the provisions of the Occupancy Agreement remained in full force and effect. On or about September 29, 2004, the Debtor informed Helen-May that it had stopped payment on the check representing the first payment under the Extension Agreement due to a dispute regarding the actual acreage of the Property.

**B.    The Bankruptcy and the Debtor's Continued Occupancy of the Property**

While the acreage dispute was percolating, the Debtor filed a chapter 11 petition on October 4, 2004.[4] Post-petition, it continued to occupy the Property. At some time subsequent to the petition date, former Bankruptcy Judge Blackshear issued a bench order directing the Debtor to pay Helen-May $5,000 per month for its use and occupancy of the Property. In or about May 2005, the Debtor ceased making the monthly payments. Helen-May subsequently filed a motion seeking, among other things, to lift the automatic stay to evict the Debtor, and in the event the Debtor continued to occupy the Property, to require the Debtor to pay monthly use and occupancy, which Helen-May estimated to be $12,000, as adequate protection payments.

The hearing on Helen-May's motion occurred on July 20, 2005. The Court ruled from the bench that, effective July 1, 2005, the Debtor must pay adequate protection payments to

---

[4]    On or about November 24, 2004, the Debtor filed a second Chapter 11 petition with this Court, under the name Mateh Ephraim LLC d/b/a Kollel Mateh Efraim, LLC, Case No. 04-17525, purportedly to correct the first petition. By Order dated November 27, 2006, the Court dismissed the second bankruptcy case and ordered that the caption of this Bankruptcy Case be amended to its current form.

4

Helen-May on account of its continued occupancy in the sum of $11,677 per month, plus real estate taxes equal to $1,876 per month, or a total amount of $13,553 per month (the "Adequate Protection Payments"). The Court also ruled that if the Debtor assumed the Contract, as it intended to do in connection with its plan, it was "obligated to pay $1,500 a day for every day they [the Debtor] didn't close after November 29th [2004] and they [the Debtor] remained in possession less what they paid for use and occupancy." The foregoing was subject to the Debtor's right to argue that Helen-May was foreclosed from seeking the $1,500 per day charge by virtue of prior rulings by Judge Blackshear.[5] The proceedings appeared to be at an end when the attorneys suddenly announced that they had reached a settlement.

Following the lunch break, the Debtor's attorney and Helen-May's attorney, Gerald Orseck, set out the terms of the settlement on the record; the Debtor would purchase the Property from Helen-May for $1,725,000, less the deposit, plus certain real estate taxes that Helen-May had paid in advance. (JX 8, at 56–57.) However, Helen May subsequently repudiated the settlement contending that Orseck lacked the authority to enter into it. Substantial litigation ensued, and the Court concluded in February 2007, following a trial, that Orseck lacked authority. See In re Kollel Mateh Efraim, LLC, No. 04-16410, 2007 WL 634079 (Bankr. S.D.N.Y. Feb. 23, 2007). The Debtor filed a notice of appeal, but the District Court eventually dismissed the appeal based on the Debtor's failure to file its appeal brief by the extension date of October 10, 2007.

---

[5] The July 20th hearing is discussed in detail in In re Kollel Mateh Efraim, LLC, No. 04-16410, 2009 WL 2929430 (Bankr. S.D.N.Y. Aug. 18, 2009).

5

In the meantime, no one submitted an order requiring the payment of the adequate protection fixed by the Court, and Helen-May never sought any Adequate Protection Payments, or at a minimum, an order directing the Debtor to escrow them. However, following the Court's decision vacating the settlement, Helen-May's new counsel noticed a proposed order requiring the Debtor to make the Adequate Protection Payments dating back to July 1, 2005, and to make all prospective Adequate Protection Payments as they became due. By then, the accrued adequate protection arrears totaled $210,120.[6] The Debtor raised only one substantive objection to the proposed order: it was entitled to an additional $5,000 credit. (See Debtor's Objection to Helen-May Holdings, LLC's Notice of Presentment of Proposed Order (ECF Docket No. 112), dated Apr. 23, 2007, at 2 (ECF Doc. # 116, filed in Case No. 04-16410).) On April 25, 2007, the Court signed an Order (the "April 25, 2007 Order") directing the Debtor to pay Helen-May $210,120 within 30 days and $13,553 per month commencing May 1, 2007.

The Debtor failed to make the May 2007 Adequate Protection Payment. As a result, Helen-May moved on May 14, 2007, inter alia, to lift the automatic stay with respect to the Property and hold the Debtor in contempt. The Debtor submitted the affidavit of the Defendant Rabbi Abraham Steinwurzel, sworn to May 21, 2007 (the "Steinwurzel Affidavit"), (JX 16), in opposition to the contempt motion. According to his affidavit, Rabbi Steinwurzel "work[ed] closely with the Debtor's Managing Member, Jack Lefkowitz in performing many functions for the Debtor, including managing the Debtor, paying its account payables, and helping raise funds for the Debtor."[7] (JX 16, at ¶ 1.) Rabbi Steinwurzel stated that "the Debtor simply does not

---

[6] This amount reflected a credit of $74,493 for amounts the Debtor had paid.

[7] In addition to the duties and activities cited in his affidavit, Rabbi Steinwurzel signed the corporate resolution setting up that DIP account at Astoria Federal Savings Bank, was the only authorized signer of checks

6

have the funds available to pay" the monthly Adequate Protection Payments, (id. ¶ 2), had "no current operating business and no current operating revenue," had not earned any money since the filing, had "subsisted on insider loans and donations from its congregation," (id. ¶ 3), and had $61.73 in the bank. (Id.) In fact, the Debtor never had any assets aside from its rights under the Contract and the Occupancy Agreement and its ownership of the Debtor Properties.

The Debtor's chapter 11 case quickly unraveled after that point. The Court lifted the automatic stay on June 5, 2007, and Helen-May sent the Debtor a 10-day notice to quit the Property. When the Debtor failed to quit the Property, Helen-May commenced an eviction proceeding. In the meantime, on August 10, 2007, the Court entered an Order and Judgment (the "Judgment") in favor of Helen-May against the Debtor in the amount of $245,779, representing the unpaid Adequate Protection Payments through July 2007. Helen-May obtained a judicial lien on the Debtor Properties when it recorded the Judgment in Sullivan County, New York.

The Court converted the chapter 11 case to one under chapter 7 October 25, 2007. On or about November 20, 2007, the Trustee and Helen-May entered into a stipulation pursuant to which the Trustee consented to the entry of a judgment of possession in the eviction proceeding in favor of Helen-May and against the Debtor with respect to the Property. By then, the Debtor had never made any payments to Helen-May for (i) any portion of the Judgment; (ii) any portion of the $1,500 per day fee provided for under the Occupancy Agreement; (iii) any monthly Adequate Protection Payments for the months of May 2007 through and including November

---

drawn on that DIP account and received the monthly bank statements for the DIP account at his home in Brooklyn. (Tr. 55.) Besides signing all of the checks drawn on the DIP account, (Tr. 68), he signed a number, if not all, of the monthly operating reports that the Debtor filed during the Chapter 11 phase of the case. (Tr. 68.) Prior to the bankruptcy, he executed the Fixler assignment on behalf of the Debtor, acknowledging the Debtor's assumption of Fixler's obligations under the Contract. (JX 2.)

7

2007; or (iv) any other payments relating to its occupancy of the Meadows Property subsequent to the entry of the Judgment.

## C. The Use of the Property

The Trustee's theory of liability and damages centers on the continued occupation of the Property for the benefit of the Defendants and the resulting accrual of substantial debts incorporated into the Judgment. Lefkowitz allowed Rabbi Steinwurzel, whom he had known for thirty years, (Tr. 106), to operate a children's camp at the Property and the Debtor Properties during the summers of 2004 through 2007 without paying for their use. (See Joint Pre-Trial Order, signed Apr. 21, 2009 ("Undisputed Facts"), at § IV, ¶¶ 40, 42.) The camp was ostensibly operated in the Debtor's name.[8] During the first summer, approximately 25–30 children attended the camp, but their families did not pay the Debtor either. (Id. ¶ 42.) The Defendants also caused the Debtor to let out rooms at the Property to families and individuals as a weekend retreat.[9] The Debtor's chapter 11 petition indicated that it earned $300,000 in 2004, but Lefkowitz testified that none of the money was received directly by the Debtor. Instead, it was paid to the vendors that provided goods and services (food, utilities, etc.) to the guests who occupied the Property. (Id. ¶ 41.) Lastly, Rabbi Steinwurzel and his family, including his wife and at least eight of his children, lived at the Property during the summer of 2004 without paying anything to the Debtor for their occupancy. (Id. ¶ 42.)

---

[8] The Debtor applied for the necessary permits to operate either a "temporary residence" or a "children's camp," or both, during these summers. Lefkowitz signed the 2004 application as "director" of the Debtor, but Rabbi Steinwurzel signed the subsequent applications as "director" of the Debtor. (JX 21–24). During the summer of 2008, the Debtor obtained a permit to operate the camp at a different location; Rabbi Steinwurzel also signed that application on behalf of the Debtor. (JX 25.)

[9] The Debtor did not operate any portion of the Property as a hotel, guest house, resort or vacation retreat during any portion of 2005 through 2007. (Undisputed Facts ¶ 48.)

8

During the summers of 2005, 2006 and 2007, the Defendants again allowed Rabbi Steinwurzel to operate the camp at the Property and the Debtor Properties for approximately 50–60 Jewish teenage boys each year without paying anything to the Debtor. (Id. ¶¶ 44, 45.) As in the past, Rabbi Steinwurzel and his family, including his wife and at least eight and up to as many as ten of his children, lived at the Property during this period without paying anything to the Debtor for their occupancy. In addition, none of the parents ever paid anything to the Debtor for their sons' attendance at the camp. (Id. ¶ 45.) One of Rabbi Steinwurzel's sons, Yitzak, attended the camp in 2005, and Yitzak and another son, Moyshe, attended the camp in 2006 and 2007. (Tr. 58–60.) Finally, one of Lefkowitz's sons was a camper in 2007, (Tr. 77), and possibly a second year as well. (Tr. 145.)

The Trustee contends that the Defendants breached their fiduciary duties as Managers of the Debtor. He does not assert that the Defendants siphoned money or other property from the Debtor. Further, he does not seek to recover damages based on the Defendants' failure to charge the families of the campers or the guests that used the Property or the Defendants' failure pay for the personal benefits that they and their families realized from their use of the Property. Instead, the Trustee seeks to recover the amount of the Judgment, which incorporates the accumulated debt arising from the Debtor's continued occupancy. He contends that the Defendants allowed the Debtor to continue to occupy the Property and incur more debt for their personal benefit, to wit, the use of the Property to run the camp and hotel. The Defendants, for their part, argue that the Debtor continued to occupy the Property for legitimate business reasons.

**DISCUSSION**

A.  **Are The Defendants Managers of the Debtor?**

The Debtor is a New York limited liability company. "Unless the articles of organization provides for management of the limited liability company by a manager or managers or a class or classes of managers, management of the limited liability company shall be vested in its members . . . ." N.Y. LTD. LIAB. CO. LAW § 401(a) (McKinney 2007) ("LLCL"). A Managing Member or Manager of a New York limited liability company must "perform his or her duties as a manager, including his or her duties as a member of any class of managers, in good faith and with that degree of care that an ordinarily prudent person in a like position would use under similar circumstances." LLCL § 409(a). Managers of limited liability companies are subject to the "same fiduciary standard applied to corporate directors." O'Connell v. Shallo (In re Die Fliedermaus LLC), 323 B.R. 101, 110 (Bankr. S.D.N.Y. 2005).

Lefkowitz was the Managing Member of the Debtor, and owed it fiduciary duties. The Debtor's Articles of Organization provide that "[t]he Company is to be managed by one or more members," (Defendants' Exhibit ("DX") 1, at ¶ 5), and Lefkowitz was its sole Member.

Conversely, Rabbi Steinwurzel did not meet the statutory definition of Member or Manager. A "Member" is "a person who has been admitted as a member of a limited liability company in accordance with the terms and provisions of this chapter and the operating agreement." LLCL § 102(q). Rabbi Steinwurzel was never admitted as a Member. Further, a "Manager" is someone who, subject to § 401, is "designated by the members to manage the limited liability company as provided in the operating agreement." LLCL § 102(p). Rabbi Steinwurzel was not designated as the Manager in the Articles of Organization and no operating agreement was offered into evidence.

Instead, the Trustee apparently contends that Rabbi Steinwurzel's participation in the management and his exercise of authority on behalf of the Debtor turned him into a de facto Manager with the attendant fiduciary duties and liabilities. (See Plaintiff-Trustee's Proposed Post-Trial Findings of Fact and Conclusions of Law, dated Feb. 18, 2011 ("Plaintiff's Proposed Findings"), at ¶ 2a (ECF Doc. # 42).) The Trustee failed to brief this point of law, and the Court's research indicates that it lacks merit. Under the analogous laws governing corporate liability, the de facto doctrine is a legal fiction designed to protect third parties who rely, in good faith, on the acts of a de facto officer. Steinfeld v. Richard A. Eisner & Co. (In re General Vision Servs., Inc.), 423 B.R. 790, 794 (S.D.N.Y. 2010). However, "as between the de facto director and the corporation, a de facto director is not a director in law or fact." Stile v. Antico, 707 N.Y.S.2d 227, 228 (N.Y. App. Div. 2000); accord General Vision Servs., 423 B.R. at 794. The Trustee stands in the shoes of an LLC suing a de facto manager, and has no claim against Rabbi Steinwurzel qua Manager because he was never an actual Manager. Cf. General Vision Servs., 423 B.R. at 794 ("Since appellant's claim is a derivative action asserted on behalf of GVS, appellees cannot be sued in their capacity as corporate directors, when they were never actual officers or directors of GVS."). Accordingly, I conclude that the Trustee cannot sue Steinwurzel as a Manager of the Debtor.[10]

B.     **The Business Judgment Rule and Burden of Proof**

The Trustee's remaining claim for breach of fiduciary duty against Lefkowitz is essentially one sounding in waste and mismanagement. The business judgment rule "bars

---

[10] This would not necessarily foreclose the conclusion that Rabbi Steinwurzel was an agent of the Debtor and owed fiduciary duties in that capacity. The Trustee has not, however, sought to posit liability on this basis or provide any analysis or legal authority to explain the scope of those duties. For example, although Rabbi Steinwurzel exercised management authority in a number of areas, he did not play a role in the decision to sign the Occupancy Agreement or to continue the Debtor's occupancy. (See Tr. 146-47.)

11

judicial inquiry into actions of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes."[11] Auerbach v. Bennett, 393 N.E.2d 994, 1000 (N.Y. 1979); accord Hanson Trust PLC v. ML SCM Acquisition, Inc., 781 F.2d 264, 273 (2d Cir. 1986); Lippe v. Bairnco Corp., 230 B.R. 906, 916 (S.D.N.Y. 1999); Consumers Union of U.S., Inc. v. State, 840 N.E.2d 68, 87 (N.Y. 2005). A corporate director does not automatically face personal liability simply because he continues to operate the corporation and accrue debts he knows it cannot pay, Kittay v. Atlantic Bank of New York (In re Global Serv. Grp., LLC), 316 B.R. 451, 460, n.8 (Bankr. S.D.N.Y. 2004), and proof of waste, standing alone, is insufficient to impose liability absent additional proof that the fiduciary acted fraudulently or in bad faith. See Stern v. Gen. Elec. Co., 924 F.2d 472, 476 (2d Cir. 1991); Lippe, 230 B.R. at 916–17.

While "New York's business judgment rule creates a presumption that a corporation's directors act in good faith and in the best interests of the corporation," Patrick v. Allen, 355 F. Supp. 2d 704, 710 (S.D.N.Y. 2005); accord Hanson Trust, 781 F.2d at 273, it shields the deliberations and conclusions of fiduciaries "only if they possess a disinterested independence and do not stand in a dual relation which prevents an unprejudicial exercise of judgment." Auerbach, 393 N.E.2d at 631; accord Croton River Club, Inc. v. Half Moon Bay Homeowners Ass'n, Inc. (In re Croton River Club, Inc.), 52 F.3d 41, 44 (2d Cir. 1995) ("It is black-letter, settled law that when a corporate director or officer has an interest in a decision, the business judgment rule does not apply."). The party challenging the fiduciary's decision or action bears

---

[11] The corporate decision must be viewed in light of the facts at the time it was made and without the benefit of hindsight. Blaustein v. Pan Am. Petroleum & Transp. Co., 56 N.E.2d 705, 715 (N.Y. 1944) ("To determine whether transactions approved by directors subject them to liability for a breach of duty we look to the facts which relate themselves to the problems involved as they exist at the time of their occurrence, not aided by those which occur subsequently.").

the initial burden to establish facts rebutting the presumption. See NCR Corp. v. Am. Tel. & Tel. Co., 761 F. Supp. 475, 490 (S.D. Ohio 1991) (citing FED. R. EVID. 301[12]); see generally 3A FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 1036, at 35–41 (Perm. Ed. 2002). If he does, the burden then shifts to the fiduciary to prove that his actions were fair and reasonable. Croton River Club, 52 F.3d at 44 ("In commercial matters, moreover, if the business judgment rule does not protect a board's decision, then the burden falls upon the board to demonstrate that its actions were reasonable and/or fair."); Int'l Equity Invs., Inc. v. Opportunity Equity Partners, Ltd., 407 F. Supp. 2d 483, 501 (S.D.N.Y. 2005) ("[W]hen a general partner in a limited partnership has an interest in a transaction, the analysis is the same as for a corporate director—the burden is on the general partner to demonstrate that the transaction is fair and serves the best interests of the limited partners."); Alpert v. 28 Williams St. Corp., 473 N.E.2d 19, 26 (N.Y. 1984) ("Generally, the plaintiff has the burden of proving that the merger violated the duty of fairness, but when there is an inherent conflict of interest, the burden shifts to the interested directors or shareholders to prove good faith and the entire fairness of the merger.").

Here, the Trustee rebutted the presumption. The evidence on the Trustee's direct case indicated that Lefkowitz derived a personal benefit from the Debtor's continued occupancy of the Property. It allowed Rabbi Steinwurzel, Lefkowitz's longtime acquaintance, to run a summer camp that Lefkowitz's son attended for at least one and possibly two years.[13] In addition, the in-

---

[12] Federal Rule of Evidence 301 states in pertinent part:

[A] presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast.

[13] Lefkowitz testified that he paid Rabbi Steinwurzel between $2,500 and $3,000 for his son to attend the camp, (Tr. 78), but this does not undercut the conclusion that Lefkowitz derived a benefit from the camp's use of the Property.

13

laws of Lefkowitz's son also spent a weekend at the Property during 2004. (Tr. 79.) This evidence was sufficient to support the inference that the decision to continue the Debtor's occupancy was tainted by self-interest. As a result, the burden shifted to Lefkowitz to show that the decision, which cost the Debtor $13,553 each month, was fair and/or reasonable.

**C.     The Reasonableness of the Decision to Continue the Debtor's Occupancy**

Lefkowitz testified, in the main, that the Debtor's continuing occupancy was necessary to maintain its value and preserve it for future development. The Property had been vacant for several years and was continuing to deteriorate. (Tr. 106.) It was not winterized, did not have air conditioning or telephone systems, some buildings lacked electricity and functioning plumbing and mold infested some of the buildings. (Tr. 106–07.) Lefkowitz ultimately paid between $1.5 million and $1.6 million of his own funds to upgrade the Property.[14] (Tr. 108–09.) In addition, Lefkowitz used his personal funds to settle outstanding debts due certain vendors and others who supplied goods and services to the Property, including All Refrigeration and Equipment, S.O.S. Communications, Mark Terkeltaub, Heavenly Kosher and Sutton Underground. (Tr. 114–16, 118–19; DX 4.) In all, Lefkowitz personally spent around $2 million for improvements, repairs and related expenditures pertaining to the Property. (Tr. 147–48.)

Lefkowitz continued the Debtor's occupancy of the Property to preserve that investment and the chance for future profit in the belief that he had a valid settlement. (Tr. at 128-30.) His belief was reasonable; Orseck had stipulated to the settlement on the record in open court.

---

[14]     Lefkowitz borrowed the money to pay for the improvements and repairs from an entity called Maskil El-Dal, Inc. ("Maskil"). (Tr. 108–11; DX 3.) He personally repaid Maskil for the sums he borrowed. (Tr. 108–11.)

14

Moreover, although the Court had denied the Debtor's motion for summary judgment in December 2005, the decision had identified several potential weaknesses with Helen-May's argument that Orseck lacked apparent authority to enter into the settlement. (JX 11, at 15–17.)

If the Debtor prevailed, it would never have to pay any use and occupancy or adequate protection. Helen-May repudiated the settlement and prevented the closing. The closing was the condition that cut off the Adequate Protection Payments (Helen-May would no longer have an interest in the Property) and any obligations under the Occupancy Agreement. Helen-May was responsible for the failure of the condition, and if the Debtor had prevailed in the settlement litigation, the Debtor could have satisfied its obligations by paying the stipulated settlement amount. It is noteworthy, in this regard, that Helen-May never sought Adequate Protection Payments or use and occupancy until after the settlement litigation was resolved. It, too, apparently recognized that its right to adequate protection depended on the outcome of the settlement litigation.

The litigation was not resolved until late February 2007. The Judgment that forms the basis of the Trustee's damage calculation included unpaid Adequate Protection Payments accrued through July 2007, or only five months after the Court's decision, and during a period when the Debtor was still pursuing its appeal from the order denying its motion to enforce the settlement.

Lefkowitz also testified that the camp was a good marketing ploy; prospective investors would see life on the Property and the Property would be maintained in a better state of repair. (Tr. 124-25; 158.) In fact, the evidence indicated that the camp spent its own money to make repairs that ultimately inured to the Debtor's benefit. (Tr. at 107–08.) At worst, allowing Rabbi

15

Steinwurzel to run his camp was little more than Lefkowitz's favor to an old friend rather than a reason for continuing the Debtor's occupancy and spending $2 million of his own money so his son would have a place to attend summer camp. The operation of the camp did not cost the Debtor anything extra or adversely affect the Debtor's plans for future development. The Trustee does not, in this regard, seek damages based on the Defendants' failure to collect rent from the camp or hotel from those who used it or for any personal benefits that either Defendant derived from the use of the Property.

I conclude that Lefkowitz has carried his burden of showing that his decision to continue the Debtor's occupancy of the Property was both fair and reasonable. The Property was valuable, and the Debtor's Contract rights were a significant asset. While in the hands of Helen-May, the Property had deteriorated and further deterioration threatened to reduce its value. Occupancy permitted Lefkowitz to spend substantial funds—his own—to upgrade the infrastructure of the Property, protecting the Debtor's asset and future development plans. Although many of these expenditures also benefitted the camp, they maintained and enhanced the value of the Debtor's investment. Furthermore, there was a substantial question, at least until the end of February 2007, whether the Debtor would ever have to pay the accruing Adequate Protection Payments, and the Debtor was still challenging the order denying the settlement's enforcement as late as July 31, 2007, the end of the period covered by the Judgment. Hence, the decision to continue to occupy the Property through July 2007 was fair and reasonable when made, and the Trustee has not sustained his burden of ultimate persuasion that Lefkowitz breached his fiduciary duty in deciding to continue the Debtor's occupancy.

The foregoing constitutes the Court's findings of fact and conclusions of law. See FED. R. CIV. P. 52(a), made applicable by FED. R. BANKR. P. 7052. The Court has considered the

16

Trustee's remaining arguments, and concludes that they lack merit.  The Clerk is directed to enter judgment in favor of the Defendants dismissing the complaint.

     So ordered.

Dated:     New York, New York
             April 28, 2011

                                  /s/ *Stuart M. Bernstein*
                                  STUART M. BERNSTEIN
                              United States Bankruptcy Judge